On behalf of the Appalachians, Mr. Christopher J. Townsend. On behalf of the Commonwealth of Edison, Mr. David M. Stahl. On behalf of the Commerce Commission, Mr. John P. Keller. All right. Good afternoon, gentlemen, and Mr. Townsend. We also, as Mr. Townsend comes up, we know you've made some arrangements with the clerk about time, and we may interrupt that if we have questions, but we will give you generally as much time as we need to get this argued. Thank you. Thank you, Your Honor. May it please the court, Christopher J. Townsend from the law firm of Quarles & Brady on behalf of the Coalition to Request Equitable Allocation of Costs Together, or REACT. This case arises from the Illinois Commerce Commission's failure to apply Section 16108C of the Illinois Public Utilities Act, which requires that the rate design of electric utilities be cost-based. The Commission made the factual finding that the rates charged to the largest customers in northern Illinois include $9.2 million of annual costs for facilities that those customers do not use. Did they actually make that finding, or did they find that the allocation of those costs to those entities was fair, understanding, from your perspective, that it was about $9.2 million? They actually made the finding that those costs were not appropriately allocated. The finding at page 51 of the order is that, quote, it is apparent from the evidence presented in this case that certain groups of facilities are not used by the larger load customers. So they made the factual finding, and that result, allowing that to continue, is contrary to the Act. Let me ask a question before you get too far. I think there's a disagreement here on what our standard of review is. What do you believe it to be and why? Well, at this point, again, given that we have that factual finding, the only real question is, what is it that the law requires? So given that finding, does that finding require anything underneath the law, which I believe is a de novo review, the application of a clear law to a fact that the Commission has already found? And you say that law is clear, and I believe that's where the other side has some argument with your de novo review, that even that first line, or the line that's at issue, using some shalls and allows and things of that nature, seem to be a bit ambiguous or maybe could be considered by reasonable people in different ways. Well, I think it's important to put that section of the law into context, and then to actually look at the words that are in that law, because the law doesn't include the word, well, it does include the word allow, but it does also give clear direction and says that the Commission shall. But that section of the law was added in the late 1990s, when the Illinois electric utility industry was restructured. It used to be that the electric utilities were completely integrated, and then in the 90s, the industry was restructured, and so the commodity of electricity used to be transported over the wires of the electric utility through one entity. But now, as a result of the restructuring, the commodity of the electricity is purchased out in the competitive market, and we only have the electric utility delivering the electricity. And so now the electric utility rate cases only deal with the delivery of the electricity, the delivery rates of the electricity. And in the 1990s, we already had the laws on the electricity, but the legislature added in Section 16108C, which requires that, quote, charges for delivery services shall be cost-based and shall allow the electric utility to recover the costs of providing delivery services through its charges to its delivery service customers that use the facilities and services associated with such costs. This is a case of first impression. That section of the Act has never been interpreted in a case that is addressing solely the rate design of an electric utility. But if that section is to mean anything, then in a circumstance where you've got the Commission making a finding that particular facilities are not used by existing classes of customers, those customers should not be charged for those facilities. Everyone in this appeal agrees that the largest electric utility customers in northern Illinois have been charged $9.2 million annually for costs that they do not incur, for facilities that they do not use. Commonwealth Edison is assigning these costs associated with these specific facilities, even though it's recognized by ComEd and the Commission that those customers don't use those facilities. The legislature, in enacting 6108C, recognized it would be fundamentally unfair to charge the electric utility customers for facilities that they do not use. But that's exactly what happens underneath this order. Well, how under the delivery system are we to parse out or divide out the single phase, the two phase, the three phase? How do we do that? And actually, Your Honors, don't have to do that. Thank God. Exactly, exactly. Again, the fact isn't contested. The appellees don't claim that the large customers do use the facilities that we have identified. That's just not an issue. But you haven't identified them all, or have you? Well, there are categories of facilities. For your clients, you've identified them, but there are other clients who aren't part of your coalition, aren't there? Other big clients? For the large energy users, all of the large energy users, and again, stepping back, how is it that we came to this? How is it that we were able to determine which facilities are used? And it's by all of the largest energy users. It's not just the subset of the REACT members. All of the large energy users were analyzed in this case. REACT had all sorts of discovery to begin the case, and we retained an expert witness who was intimately familiar with combat systems and operations and how they work. Harry Terhune is a professional engineer, specialized expertise in electrical engineering, who's joining us here today. He worked at Comet for over three decades, eventually becoming their transmission and distribution planning manager. He knows the Comet system, and looking at the data that Comet itself provided, he identified the facilities that were improperly used by the largest customers and quantified the financial impact. And the way he described this, he said, if you're trying to understand what systems are used by the largest customers and which ones aren't, view the Comet system like a forest with a bunch of trees. And the trunk of the tree is the primary system that everyone uses. For the largest users, there are three-phase wires. And you can tell the three-phase wire because it's got three different wires at the top of it. So as you're driving down the street, you'll be able to see the three-phase wires now and know what that means. There are smaller wires. There are two-phase wires, poles that have two lines. There are single-phase poles that have a single line. Those are the smaller branches of the tree. And then you've got the 4KV system, which is the tiniest twigs at the end, and then the leaves are the customers. Well, that's the only thing I didn't put in my tree, the teeny. I drew a tree as I read through that. There you go. And I'm still not sure how that happens, but I'm willing to accept that the Commerce Commission does know how. And the Commerce Commission isn't taking issue with that analysis. ComEd didn't take issue with that analysis. They don't claim that we actually do use the twigs and the branches, except in a de minimis amount. There's no dispute as to the amount that's at issue here. That's not a fact that's at issue. But yet you believe, or one of your arguments here on behalf of your clients is that, well, if you're not going to accept this argument, then we need additional study. Actually, it's twofold. First, in the first instance, the initial analysis has already been done. Mr. Terhune has gone through all of the records and determined that it's $9.2 million that ComEd has inappropriately allocated to these customers. They don't use the branches. They don't use the twigs. Those costs should be taken out right now. In the future, since ComEd, with this restructuring of the industry that is ongoing, as a result of a 2011 law, we're going to have rape design cases every three years. And so in the first instance, we said, right here, right now, we know that we don't use those $9.2 million worth of facilities. For the next case, ComEd should be directed to determine precisely who does use those facilities. And that's where you hear ComEd and the Commission saying, well, it's a complex system and it's difficult to break out the individual costs. But that's the same treatment that the Commission has ordered for the railroad class here. Is it less complicated for the railroad because it's only the one class and it's not cost prohibitive? Well, again, the question of whether it's cost prohibitive and all, there's no evidence in the record as to what costs you're looking at in one case versus the other. There's not evidence that it's only going to cost X number of dollars for the railroad or road class and Y dollars for the other large customers. ComEd never presented any evidence about what the actual costs are associated with this. It's just conjecture as to how expensive it is. And then put that into context. I mean, we're talking about $9.2 million that are improperly allocated. Again, there's no suggestion as to what the magnitude of the cost of that study is, but no one suggests that it's in the range of, you know, the error that we've identified here. And again, remember that the initial analysis is already being completed by Mr. Terhune. We already have identified it in the first instance. He was able to do that by himself. You know, in family law, and I hesitate to, you know, reduce this to a family law case, but in family law we read the language fair means just. It doesn't mean equal. And it seems to me you are trying to make sort of an equal. This is what we use. This is all we should pay. Then they should pay theirs, and so then we'd all be equal. Is that what the law really intended? Well, we did have a law that essentially said things should be equal. The law already existed in 1997. It existed since the early 1900s. It said that rates should be just and reasonable. That law already existed. In 1997, though, there was a clarification. There's a more specific statute that clarifies and says that these rates must be cost-based. When you're dealing with an electric utility who now is only involved with the delivery services, you now have to look at the costs. And it goes on to say you should look at the facilities that those customers use. So it gives that kind of specific guidance. Now, that gives guidance as to what it is that's fair. How is it that you determine what's fair for an electric utility now? Well, you look to make sure that the rates are cost-based, and you make sure that the facilities that are used by those customers are paid for by those customers. And certainly, if you've identified a group of facilities that aren't used by customers, they shouldn't pay for those. That seems to be squarely within what that 16108C contemplates. Is there an argument that some of these facilities can shift from time to time? There is. And actually, that happens with every single cost-of-service study. But does that then add to the connotation that my colleague raised that it's fairness, it's what's just, not necessarily what's equal? Because theoretically equal, not to get into how many angels are on the tip of a pen, but that equality would change every day. Well, and that's why we have... And actually, that's the way the rates are set by the Commerce Commission and have been set for ages, again, is that you have to take a snapshot in time and take a look at that snapshot in time and say, okay, based on this snapshot, who's using what facilities? And actually, now we've got a remedy for that. We don't have to wait for you have to come in and say, let's take a look to see what the rate design is and see if that's appropriate. But it's still going to be based upon the snapshot in time. And that's true whether you use the type of analysis that Mr. Turgeon advocated for, that REACT put forward, or if you use the type of cost-of-service studies, the embedded cost-of-service studies that COMET puts forward. In each case, you're going to have a snapshot in time, and that snapshot in time is going to be able to advise as to how it is that those should be... Those facilities should be allocated. But regardless of when it is that you're looking at that snapshot, if you've got in that snapshot facilities that are not used by particular customers, those facilities shouldn't be assigned to those customers. Is this a question of they're never used by those customers or they may be used by those customers in that snapshot, but they're not regularly used by those customers? Again, Mr. Turgeon went through and did the actual analysis of how much of these facilities... How many of the twigs... I could draw the tree, but I don't know that I could get beyond that. Right. And again, remember that with the Commission's factual finding here, they already have decided that we agree that there are facilities that these folks do not use. And there's no dollars. I mean, there's not another expert that says, oh, it should only be $9.1 million. That's not the evidentiary record here. The Commission has accepted that already. So in this case, we don't have that type of factual dispute. We've got a factual finding by the Commission. It deals with this $9.2 million worth of annual costs that are assigned to these customers. And the Commission just decided, as a matter of policy, that it was not going to assign the costs to the cost-causers. It was going to continue to charge these customers that $9.2 million every year. And are you saying, on behalf of your customers, that $9.2 million is per se unfair? I will write unfair or there is some wiggle room. We all agree on the figure, but are you saying that $9.2 million that should stay there? Well, the $9.2 million actually includes, what we've suggested, is that that's a half a percent of ComEd's entire revenue requirement. And so what we've said is, in the first instance, everyone should just pay the half a percent more. So spread it across the entire rate base. For a residential customer, it would be about $0.22 a month that they would pay. So that's what would be fair in the first instance, is just spread those costs among everyone. And then, again, we'll have another chance to take another snapshot. We'll be able to look at the facilities to see if the number has changed. If there are other facilities that we are using, that other classes of customers are using, we're going to have another opportunity that's mandated by law to take another look at the rate design. Would any amount be unfair? I mean, I guess maybe that's my question. If it was, oh God forbid, if it was $10, that would be unfair. And again, unfortunately, that's not what we're talking about here. But if you've got a case where the Commission makes a specific factual finding that says, here's the $10 of costs, we know that these customers don't cause that cost, but we're still going to assign them those costs, that doesn't seem to square with the direction that has been given to the Commerce Commission, the clarification that was given to the Commerce Commission that says that these charges shall be cost-based. And again, to look at the facilities that are used to serve these customers. Again, this one's not dealing with a diminutive amount. This is $9.2 million going on each year. But if you have that kind of finding, there's not a wiggle room that says in the law, except that unless it's beyond this threshold, then don't do it. We've got a factual finding. We've got a clear law. REACT respectfully requests that you direct the Commission to apply that law. You know, I think someone pointed out, Justice Hutchinson, I think in the beginning when she asked you what the standard of review was, that this is somewhat of an interpretation of 16-108, isn't it? And how the Commission interpreted it, how your opponents, you interpret it. The charge shall be cost-based, as you said. And then it goes on and says, and the charges shall allow for the aforementioned cost recovery method. What's your interpretation of that? Explain to me how that would work. Well, the shall, so the shall allow, the allow portion is saying that the utility is not guaranteed to be able to recover those costs, but it shall allow the possibility for the electric utility to recover those costs. So it's saying that it doesn't have to be a dollar for dollar true up. If, for example, and again, that deals with the size of the pie, how much ComEd is actually going to be able to recover. So what it's saying is that ComEd shall have the opportunity to be able to recover all of those costs based on a design of rates that's designed to recover those costs. So the charges shall be cost-based. You'll take that snapshot and you'll say, okay, we're going to design the rates based on that snapshot. And if all of the assumptions are correct that we have about the amount of usage, for example, that's going to occur in the system by the various different customer classes, then ComEd is going to be able, shall be allowed to recover those costs. They aren't guaranteed underneath this provision to be able to recover those costs, but rather it provides them with the opportunity. Well, then how can the first section shall, how can that first clause then be mandatory? Well, the charges shall be cost-based. So when you develop those charges, when you've got those assumptions, the idea is not to shortchange the utility, right? You shall take a look at the costs that the utility has, and you shall look at, later it says to you, look at the facilities that each customer class has, right? So the charges shall be cost-based. You look at the, for each customer class, what facilities it is that they use in order to be able to build that up for that snapshot. And then going forward for that next three-year period, ComEd is allowed the opportunity to be able to make up that entire amount that it was offered to make. And by the way, if they operate more well, you know, there are opportunities for them to have an upside as well as a downside based upon that. They're allowed to be able to, they could recover even more. But in terms of the charges, how it is, what is it that you're going to, how is it that you're going to come up with the charges? Those charges shall be cost-based. When you're coming up with that, each one of those categories, as you build that up with each customer class, you look at it and you say, what are the costs that this customer class has? What are the costs that this customer class has? And that's, frankly, that's how ComEd determines which customer classes you're going to have. It's not based upon, you know, the alphabetical order or something. It's based upon what costs each one of those classes incurs on the system. And so looking at the system that way, looking at that class of customers, you are able to sit down and say, we can determine what charges should be assigned to you, what charges should be assigned to other people based upon that. And that is mandatory. All right. You'll have an opportunity for response or reply if you so choose. Thank you. Thank you very much. I guess Mr. Kelleher's first. Good afternoon, Your Honors. Good afternoon. This is a rate design proceeding that was before the commission. And this is after the revenue requirement has been established and what costs the utility is allowed to recover. Then we have to divide that up and send that to the various customer classes and then design the rates that will allow them to recover their revenue requirement or get an opportunity to recover their revenue requirement. And it's an extremely complex type of an analysis, as you can probably imagine when you're looking at single phase, 120 volt service to residentials all the way up to 69,000 kilovolt service to the large customers and so on. And because of the nature of the inquiry, the commission is always considered to have a great amount of deference owed to its decisions. And so what you're looking at is an abuse of discretion standard as to whether or not the commission properly allocated costs and designed the rates. And even if, I mean, and I think one of counsel's points, even though he doesn't agree with his point is between and among the parties that were at this hearing, there is this $9 million gorilla in the corner that seems to be causing a problem that seems to be outside of the mandate of that statutory section. So how do we deal with that? Because it doesn't, the rates charged to the REACT customers do not seem to be cost-based in that amount. Well, the question is how granular do you get in your cost-based analysis and what level of granularity is required by the statute? Because they're looking at themselves and saying we, the subclass of the primary customers, we don't use everything. And so the statute says that we should only be required to pay for the use of facilities that we use. But what we're looking at, I don't think that 16108C states that at all. I think there's a reasonable debate as to the meaning of this because it says charges for delivery services shall be cost-based, shall allow the utility to recover the cost of providing delivery services. And then it goes on to say that the charges are to customers that use the facilities and services associated with such costs, which are the delivery services. So what the commission has done, consistent with industry practice, is decide on the level of service, divide into two broad categories, secondary, which is all the larger customers, and then allocate based on the customer's usage of the system in terms of the coincident peak. And I don't know if that's, utilities build out their systems for the peak day. And so what they do is they look to the peak day of the utility, look at what the peak usage of all the customer subclasses are, and then allocate to them based on their usage. And so if we're going to look at this at first instance and say, you know, what is the meaning of 108? Does it really require that each customer class, each customer, each customer subclass has to recover only for what they use? And it doesn't say that. The commission, you know, if the court looks at it and says it's not But if you look at it and say there's reasonable debate as to the meaning of the statute, then you're supposed to grant the commission some, a fair amount of deference in the interpretation of the statute. Well, since you're meeting, or you have to do this rate review every three years, theoretically we're talking about $27 million, I suppose, in some change. Is there an amount, I ask the same thing of counsel, is there an amount where it's not an issue? Or do you have, according to the statutory authorities, that the commission's feeling that they should get it down to as small a discrepancy, or are you calling it granulation? I'm not sure. As small a discrepancy as possible. I'm learning new words. I don't think there's an amount that's really at issue. The question is, how do you recover the cost of the primary system? And the commission and the industry recovers them by allocating them out to everyone that uses the system, not necessarily all of the equipment. And, for example, you know, I'm a residential customer. I imagine everyone in the room is. And I use single-face service, and yet I'm allocated three-face. Service costs. I don't use those, and yet I get an allocation of it, because systems are built to serve everybody. And is that the concept of facilities and services? The statutory authority doesn't talk about just facilities, and that seems to be a target of REACT, but it's facilities and services. Is the services what makes this more difficult? I think it's services. Well, I think they're concentrating on the use of facilities. But it's more than just that. This authority covers and services, correct? Yes. Okay. Does that change anything if you include both? I don't think so. I think it's just the level of your inquiry and whether or not it's reasonable to say the costs of operating a two-kilovolt system and up are divided amongst all rate payers, including the secondaries, because that's the way systems are built out. The main stress that REACT has put on during their briefs and their reply brief is that the cost studies are totally inadequate and they've been terrible, and they're really kind of putting a different spin on what was actually going on, because starting back in 05, in the 05, or 04, 05-97, when the commission was looking at all these cost studies and finding them to be deficient in various ways, it was always based on the allocation between secondary and primary costs. And REACT is kind of giving the impression that the subclass category to decide who's using what facilities, and that's simply not the case. What has finally occurred over time is that now the county has provided the commission with what it needs to do to allocate between primary and secondary. And I don't think REACT is saying that there's anything wrong with the cost studies in those respects. It's just that they say we don't use some of this primary equipment, so it should not be allocated to us, it should be allocated to everybody else. Well, did the commission, I mean, I think the commission gave some sort of direction in 2011 to ComEd about what they should do. When ComEd came back in 2013, did the commission sort of chide them for only looking at certain facilities? Did they want more, or was it just one of those, you didn't follow our direction but we'll accept this as you presented it? Well, by the time we got to the 2013 case, they finally met the commission's concerns except for they, I don't think they properly pulled the railroad class out in the way that the commission wanted them to do. But what was initially in prior cases were things like there's combination poles that are used that carry both And the commission wanted them to do an analysis of those, and what ComEd had done is looked at its charts and things like that, and it didn't go out and make an inspection. So it's things like that when they were trying to allocate facilities between primary and secondary that the commission didn't think ComEd was doing the right job. Another example would be a transformer. Do you allocate that based on just the voltage coming in or the voltage going out? And ComEd I think had been doing it, so it said it's primary if the voltage going in is primary, even though it's being stepped down to secondary. So it's issues like that that the commission was concerned with. ComEd finally got that all together, and now we've got something that it properly allocates everything out to the primary and the secondary classes. But there is still, for lack of a better term, this $9 million. So what is that? What do you call that? Well, I think that is a recognition that cost studies aren't perfect. They make reasonable allocations so that the revenue requirements can be recovered. It recognizes that systems are built to serve everybody. It recognizes that, as I was saying, the residentials pay for things that they don't necessarily use. One of the things that our staff is getting at is if you're going to start going down to more granular levels, again, I'll use that, what about the situation where there's a group of residential customers, an area of residential customers, and some big customer comes in, and they built a big line to serve them, and everyone's going to end up paying for that, even though those costs aren't necessary to serve residential customers. So the staff would think that if you're going to start getting into those kind of things, that you're going to have to be fair and look at other things. Well, ComEd doesn't deny that they can perform these studies, correct? Right. And Mr. Stahl, I think, was intending to address that particular issue. Okay. But anyway, the other big issue, and I'll do this very quickly, is that they would like to be treated the same as the railroads. And the railroads are a far different class, not only because there's only two of them, but they're quite different. They're also governmental units also. They also uniformly take at the same 12-kilovolt level. And the Commission stated in several of its orders, it said, there's a policy of encouraging conservation, efficient energy use, environmental benefits, affordable transportation. It's deciding to allocate costs or cost recovery based on some societal values, too. And those don't apply to REACT. And that is part of the wiggle room is a bad term, but that's part of what is considered in the allowing portion of this, the more discretionary portion of this. Right. So it's a consideration. The Commission does start with costs, but, for example, if someone like REACT members are not recovering their cost of service, which is why they're getting disproportionate amounts of increase, then do you move them right away? Do you move them to 100 percent of their cost recovery, or do you, over a period of time, you say, well, it's 25 percent this time, that was one of the earlier orders, 50 percent next time, and so on, and you move them gradually? Thank you. Mr. Stahl. Good afternoon, Your Honors. May it please the Court. David Stahl, S-T-A-H-L, on behalf of Commonwealth Medicine Company. There's a fundamental question here about what the statute does require, and, Justice Hutchinson, I think you started out your questioning with the question about isn't this statute susceptible of a reasonable difference of opinion. It certainly is susceptible of different readings, and I guess I would agree that what REACT is proposing here is not entirely unreasonable, if you look at the language, but I do think it's the wrong interpretation, and just by way of legal background, this Court has already addressed this question with respect to 16108C in a different case, a case from 13 years ago, a case of Commonwealth Medicine versus the Illinois Commerce Commission, and 16108C was directly involved, and the Court there essentially held that this is a statute that is somewhat unclear. It can be susceptible of more than one reasonable interpretation, and when that is the case, the Court might find it appropriate to defer to the interpretation placed on the statute by the Commission, and the Court did do that in the case I just cited from 2001. I think it's important to understand several things. First of all, of course, 16108C does not require what REACT says it requires, which is to ensure, the Commission must ensure that no customer must ever pay for a facility that it does not use. And again, Justice Hutchinson, you asked, does it make a difference whether it's $9.2 million or is it $10? And I think the answer to your question is, under the REACT interpretation, it does not matter. If it's $10, it's inappropriate, and the Commission cannot allow that to happen. But didn't the individual, I'm sorry, from the Commerce Commission, Mr. Kelleher, didn't he just indicate that sometimes you pay for things that you aren't using? Absolutely, and that is permissible under what we think is the correct interpretation of the statute. The statute simply requires, not simply, it's an important point, but it does require that these delivery service charges be cost-based. No one contends in this case that these charges are not cost-based. They go on to say, well, what cost-based means is we need to have this precise allocation. And as Mr. Kelleher said, and as we agree, the statute simply requires a reasonable allocation of costs. We have struggled over decades to find appropriate ways of allocating costs. This hasn't been done simply since 1997, when 16108C was enacted. This has been done throughout the entire history of regulated rate setting. Okay, you're talking about it must be a reasonable allocation of costs, and getting back to what my colleague asked you before, all right, maybe $9 million, $9.2 million still is reasonable, but at what point is it no longer reasonable? That's maybe asking the question from a different perspective. It is, and I think it's a very appropriate question, but I think the focus probably ought to be on the allocation methodology and how it divides up facilities between and among customer classes, as opposed to is it reasonable if it's $10 million off, and is it unreasonable if it's $20 million off? I mean, the touchstone of reasonableness has a finite end. Something becomes unreasonable at a point, and I'm asking you, where's the point? If we were to assign high voltage lines simply to residential customers, that would be an egregious misallocation and an unreasonable allocation of the cost of facilities, and I don't think it would matter if the result of that allocation was $10 or $9.2 million. It just simply makes no sense to assign all of those facilities to a residential customer class. What we are striving to achieve here are reasonable allocation methodologies. If we could directly assign all of the costs of every facility used to serve customers to specific customers, we would do that, because that is the best way to achieve a reasonable result. It's our system, but it's not a function of the system. It's a function of how do you separate all of these costs out, because as Mr. Kelleher said, this is a system that is not built just to serve residential customers, and then we have another aspect of the system built to serve commercial customers and yet different facilities. The reasonableness all goes to we have to have one mechanism that takes care of a single one-bedroom apartment as well as an enormous manufacturing plant. Yes, and we have a number of customer classes based on broad general characteristics of those classes. At one time, the residential class was subdivided into those using space heat versus those not using space heat because they had different characteristics of usage. They imposed, it was believed, different costs on the system, and the railroad class is a good example of that. Two customers in that class operate in two counties. They all take power at a single voltage level. The commission had decided years ago that ComEd should not charge those customers for certain facilities based on an entirely different record that's not involved in this case, and that made sense, but that's two customers. ComEd has 4.8 million points of delivery, thousands of miles of circuits. It's an extremely complicated system. I'm not saying we couldn't do a study that purported to look at this on a customer-by-customer basis. After all, you can study anything. Our position has always been, yes, we haven't done the study. We believe it would be extremely expensive. It would be extremely contentious because the customer who feels that he or she is being overcharged by $10 will have every right to complain about that overcharge, as Mr. Townsend's customers complain about the $9.2 million. So it's not only going to be contentious, but we're, at the end of the day, not going to achieve a result that we think is really any more accurate in the aggregate than what we have today. And I think a perfect example of the last point that I just made is the proposed solution that Mr. Townsend has for this case. They want to take that $9 million, and they want to allocate it to all other ComEd customer classes. And even if the statute means what REACT says it means, that would be an absolute violation of the statute because what it would do is it would take some of those $9.2 million, it would allocate them to customers in what is known as the large load and very large load customer classes. And Mr. Terhune testified in the case that those customers are already paying for single and two-phase service when, in fact, they don't use single and two-phase service. And as a result of this reallocation of the $9.2 million, those large and very large load customers would pay for even more facilities that they do not use. So I don't think there's any basis to conclude that the statute means what REACT says it does, but even if it does, what they propose here would simply perpetuate a violation under their own interpretation of the statute. I have a question before you get on to another. Are there any facilities within this particular litigation that clearly, as in the railroad situation, clearly are not used by these REACT customers that can be identified, or have those already been identified? Well, I don't question that Mr. Terhune identified some facilities that are not being used by some of the customers in the REACT class. We've never contested that. But what that leads to is the impossibly slippery slope of them essentially having to do a customer-by-customer analysis. We can't just limit it to customers who are claiming that they're being overcharged by $9 million. There's no principle that would allow ComEd to do that. If we only did it for the large customers, that would be discrimination. You have to do the study for everybody if you're serious about this interpretation of the statute. You don't deny you can do it. It's just a very intensive study. Let me say this. I'm not an engineer. I'll speak for our engineer in the back and say, yes, I believe we could do it. I wouldn't deny that we could do a certain study. But here's an important qualification to that. And that is, this goes to the freeze question, not necessarily the reallocation of this $9.2 million. They want this rate design frozen until we perform a statistically valid study. Now, who is going to decide what a statistically valid study is? If there's a freeze in effect, it's going to be up to this court to decide what a statistically valid study is. And I don't know how in the world this court would do that, with all due respect. It would be difficult enough for the Commerce Commission to do that, much less this court. So I think, yes, we could study it. Is anybody going to be unhappy with the results? Absolutely. I can almost guarantee you that every customer class will be unhappy with the results, because you're looking for spurious precision, something we will never achieve when you're trying to slice so thinly the costs of a system as complicated as comments. Which is the three-year program established by the legislation, in part designed to cure some of this problem? Because it can be, it must be looked at every three years for possible reallocation. Absolutely. And, you know, this three-year window is kind of the result of new legislation that was enacted in 2011, which essentially provides for annual revenue requirement cases, the size of the pie, as people talked about it. But I think the General Assembly, and certainly the Commission, recognize that as part of those revenue requirement cases, you don't want to go through this reallocation process every year. That's why they decided to do it every three years. It used to be, back in the old days, before 2011, that every time the utility filed a new case to set a new revenue requirement, the size of the pie, that case would also involve these allocation and rate design issues that we are here before the court today. But the difference is, those cases were not every year. They might be every two years, three years, four years. And they also had an 11-month time frame in which they had to be done. It's no longer 11 months. It's a much shorter process under the new Act. So that's why you have these allocation cases every three years. But sometimes, assuming somebody is going to disagree, it might not be done at the court level by the time you're stepping into the next allocation period as well, correct? Absolutely. That has happened from time to time. And there are provisions to deal with that, dealing with refunds and things of that nature. It's unusual when that happens, but it's not unprecedented. In fact, this court was involved in a refund case very recently from the 07 rate case. I know I'm pressing my time. I would just like, on this interpretation question, if I could just make a couple of points about that. As Mr. Townsend said, in 1997, when 16108C was passed, that was part of a general restructuring of the electric utility industry in Illinois in which delivery services, what we're talking about here today, transmission and distribution facilities, were separated from so-called production facilities. The power plants that actually generated the electricity. Those were divested into separate corporations. And in our view, what 16108C was intended to accomplish was to make sure that when rates were set for delivery services, no part of those former generation or production facilities became part of the utility's cost base. That's why they say that essentially these delivery service charges shall reflect the costs of the services and facilities required to provide those services as opposed to production and generation. And I think it's important to recognize that there was nothing in the legislative history, and of course the legislative history in Illinois is generally pretty sparse, although we do have some in recent amendments to the Public Utilities Act. But when this was done in 1997, there was no great outcry on the part of the General Assembly that cost allocation had been badly mishandled by the Commerce Commission for the previous 84 years since there was regulation in Illinois. There was no dissatisfaction with cost allocation methodologies that were used. So there's no indication that the General Assembly wanted to change the longstanding practice of cost allocation. And I think I can speak for everyone in this room when I say there has never been a Commerce Commission decision or a court decision prior to this case. And actually including this case because the Commission rejected it here. But no case has ever held that cost-based regulation requires this kind of fine, thin slices of cost that REACT says this new statute requires. It's never been done. In fact, in the 07 rate case, which this Court heard the appeal from, REACT had proposed that the Commission require ComEd to prepare customer-by-customer analyses of cost. The Commission rejected that, and although an appeal was taken to this Court, REACT did not, despite its position today that 16108C requires that customers pay for only what they use. REACT did not appeal that decision to this Court. In the text of 16108C, I think there are a couple of things that are worthwhile pointing out that I think show, if any further evidence were necessary, that REACT's interpretation is simply incorrect. And when you point that out, if you're going to do that, I would ask you then to wrap up. Yes, I will. Absolutely. These are the last two points I make. In 16108D, it requires that in setting delivery service rates, the Commission shall take into account voltage-level differences. Now, if 16108C meant what REACT says, 16108D would be unnecessary, because that's a specific direction to consider different facilities that would be used to serve different customers. Similarly, 16108E requires that in setting rates, the Commission shall allow recovery of the costs of facilities for the particular benefit of a customer to be recovered only from that customer. And again, if 16108C meant what REACT says it meant, then that provision would also be unnecessary, because you can only charge customers, and you must charge customers, only what they are using and only what they are benefiting from. So I certainly appreciate the Court's indulgence, and if you have any further questions, I'm happy to answer them. No, thank you. Thank you. Mr. Townsend? How do you respond to his interpretation of 16108 when he talks about D and E? He's saying that those basically would make C impossible to interpret as you did. All right. And again, we don't have the benefit of Mr. Stahl briefing this issue for the Court, and so it's not addressed in the briefs. And we'd welcome the opportunity, if the Court would like to be able to do so. But those are additional requirements in the Act. Those specifically in sub E, it talks about a specific customer's request could be requested with regards to voltage changes, and sub D deals with the charges and terms and what that means. So, again, it's not briefed before this Court, but those are separate sections, and no one is claiming that those are going to be impacting the way in which the Commission should be interpreting Section 16108C. Section, again, they want to do everything other than looking at what the actual text of this law says, you know, talking about the history of what the law was and things of that sort. Well, the legislature enacted a specific statute that does require something more than just having just and reasonable delivery services rates. The legislature directed that for this new era, there is a change. There is something more. We're not just looking at just and reasonable rates. It doesn't even say that the rates should be reasonably cost-based. And so it says that they shall be cost-based. So, although it's nice to think about the different hypotheticals that they throw out there, again, the idea that you've got, you know, a de minimis amount underneath some hypothetical, that you've got a specific Commission finding here. And, again, the findings of the Commission are due deference. The Commission's finding is that these facilities are not used by these customers. And so if there's any question of what it means, what the statute means, and, again, there's not a unique statutory interpretation that's actually been put forward here. There's not an interpretation of cost means, you know, reasonable cost. And that's not what anyone has argued in the briefs. That's not what's before you. What we've got is a statute that's very clear that says that these charges shall be cost-based. And we've got a Commission finding that's also equally clear that says that these costs of these facilities are not caused by these customers. In that situation, this law requires a different outcome. This law requires that those facilities not be charged to these customers. All right, but then your solution or your suggestion earlier of taking that amount and spreading it out one-half percent across the users, I'm not, and I know that Mr. Stahl made an argument that your clients might actually be paying a little more, but that's not where I'm going. I'm looking at what about me or any of us in this room who aren't one of the REACT members or the big users, without looking specifically at what my services or my, you know, what I use isn't putting a half percent on top of my bill unreasonable. Well, we do know that these systems are out there, and we do know that the smaller users use those systems. Again, the tree and the branches, you know, you've got the leaves at the end that are served not only by the smaller branches, but the trunk and the larger branches also provide services in order to be able to get to the smaller level of the lines. You have to go through the big lines, and then it gets stepped down through the different transformers that Mr. Kelleher discussed. But isn't it more expensive in the three lines than in the one line? Well, except that in order to be able to get to the one line, in order to be able to get out to the leaf, you first have to travel through the trunk. You have to travel through the branches, and then you go out to the smaller branches. The large branches get to the smaller branches and out to the twigs. So the twigs and the leaves at the end are using the rest of the system in order to be able to get there. And again, our customers use the trunk of the tree, and so we pay for the trunk of the tree. We've got a factual finding here by the commission that we don't use those branches out at the end. We don't use the twigs. And we have a situation where with the railroad class, the railroad class demonstrates that you can do this type of analysis and that this type of facilities-based analysis is what should be done. Wasn't that just two customers, though? Isn't that substantially easier than, I don't know, 4 million? It's odd that you say that because one of the criticisms that the commission has of our suggestion is that it was too narrow in terms of the number of customers. That was in the context of a different response, though, wasn't it? Well, we've got 72 customers here. And again, the initial analysis has already been done. So in terms of the complexity of the analysis, that type of analysis, just like it can be done for the railroad class, it can be done. It actually has been done by Mr. Terhune for these largest customers as well. Can you get to the level of granularity so you can determine better which classes of customers should be charged more? Yeah, you can. And Mr. Terhune suggested that that's what we should do for the next time around. But with regards to these costs, we know that these customers don't cause these costs. So make that adjustment now. And if someone else comes forward and says, well, we don't use those facilities either, then make sure that they don't get charged either. But that's not the record that we have here. Well, you said that if it was extended a half percent across the area, my monthly bill average would be about $0.22. How do I know that I used that $0.22 worth? Well, and again, it is a question of once you – you're right, Your Honor. For an individual customer, we're not advocating the individual cost, despite what they suggest. We're not advocating that you get down to the order. But you suggested that you just take it and put a half percent across everybody who uses it. I use electricity. Justice Shostak, Justice Jorgensen. So we're going to get an additional $0.22 a month. I don't know that I use that. Well, except that that's what the study actually found. You can have mine. That's what the study found, is that these customers don't use it. You've got other customers that do use it in terms of the customer classes, right? So as opposed to the 69 customers that we're talking about in this class, you're right, Your Honor. It would be spread out amongst the 3.8 million customers that actually do use those facilities. And that's actually how we got to this whole primary-secondary split that Mr. Kelleher referred to. There are only 300 customers in that class. But there are 300 customers in that class. And the commission said, despite, by the way, the protestations of ComEd, that this is going to be costly and this is going to be burdensome, the commission said, no, based on cost causation principles, you should identify what those costs are, and they actually go through and they say the extra 3.7 million customers should be charged that extra additional amount because that system is, they do use that system. And we know in this case they do as well. That is what that analysis says, is that we know, again, if you think about the types of wires we're talking about, you know that if you're driving by a factory, you're not going to see the thin wires, but you know that in your backyard those single-phase wires exist. Those are out there. Those are where those costs reside. So you can only get to those single wires by going through the 3K. In order to be able to get stuff done. Again, electricity isn't generated at the lower levels. So in order to be able to get there, you have to go through some system in order to be able to get there. You don't in every circumstance have to go precisely through those particular branches, but you need to have the step down in order to be able to get down to that wire. You can't have that wire connect to a generator. So, again, you get the benefit of having all of the system that exists prior to the time you get out to the leaf. Your Honors, we do have a clear law. The case that Mr. Stahl referred to about the beginning of competition, we had a finding by the commission there that the costs were, they knew what the costs were, and you deferred to the commission's factual finding that here are what the costs are. Here we also have a factual finding. We have a factual finding that these customers don't cause these costs. The question is, what do you do in that circumstance? And the law says that look at those facilities and make sure that the charges reflect the facilities that those customers use. We respectfully request that you reverse the commission's decision and direct the commission to assign the costs to the cost causes. Thank you. All right, gentlemen, thank you for your arguments. We will make a decision in this matter, hopefully before the next rate design is over. And we will now stand adjourned.